SELBIA A. STONE AND PHYLLIS M. STONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stone v. Commissioner
Docket No. 7539-77.
United States Tax Court
T.C. Memo 1986-397; 1986 Tax Ct. Memo LEXIS 215; 52 T.C.M. (CCH) 264; T.C.M. (RIA) 86397; August 25, 1986. *215 Petitioners engaged in numerous transactions in 1969 and 1970, most of which were in connection with their real estate business. Their records and books of account clearly were inadequate. By 1972, respondent had begun to examine their tax returns, records, and books in connection with possible criminal prosecution. Both petitioners were indicted for criminal tax fraud (sec. 7201, I.R.C. 1954); petitioner-wife was tried and acquitted, and petitioner-husband's indictment was quashed. The notice of deficiency in the instant case was sent to petitioners more than 6 years after they filed their 1969 tax return and more than 3 years (but less than 6 years) after they filed their 1970 tax return. Held: (1) Respondent has failed to prove by clear and convincing evidence that either petitioner committed fraud with intent to evade tax as to either 1969 or 1970. (2) Respondent has proven by a preponderance of the evidence that, for 1970, petitioners omitted an amount of gross income (properly includible in their 1970 tax return) more than 25 percent of the amount of gross income stated on their 1970 tax return. (3) The statute of limitations bars assessment of tax for 1969.Secs. 6501(a) *216 and 6501(c)(1), I.R.C. 1954. (4) The statute of limitations does not bar assessment of tax for 1970. Sec. 6501(e), I.R.C. 1954. (5) Amount of deficiency for 1970 determined. (6) No addition to tax imposed under sec. 6653(b), I.R.C. 1954. Daniel D. Akel,Edward C. Akel, and Kathleen F. Holbrook, for the petitioners. Ben G. Reeves, for the respondent. CHABOT MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6653(b)[1] (fraud), as follows: Additions to Tax
Year
Deficiency [2]
Sec. 6653(b)
1969
$50,316.67
$25,158.34
1970
69,798.76
34,899.38
After concessions, the issues for decision [3] are as follows: (1) Whether the assessment and collection of a deficiency for 1969 are barred by the statute of limitations (sec. 6501(a)) or are allowed under the fraud *217 exception (sec. 6501(c)(1)) to the general period of limitations; (2) Whether the assessment and collection of a deficiency for 1970 are barred by the statute of limitations or are allowed under the fraud exception or the substantial omissions exception (sec. 6501(e)(1)) to the general period of limitations; and (3) If assessment and collection are not barred for either 1969 or 1970, then, for that year -- (a) whether petitioners received unreported taxable income in the form of commissions, forfeited deposits retained as damages, wages, capital gains, and interest; (b) whether petitioners are entitled to deductions for certain expenses, including legal fees; and (c) whether petitioners are liable for additions to tax under section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Selbia A. Stone (hereinafter sometimes referred to as "Selbia") and Phyllis *218 M. Stone (hereinafter sometimes referred to as "Phyllis"), husband and wife, resided in Chiefland, Florida. During 1969 and 1970, Selbia, a licensed real estate broker, was engaged in the real estate business under the trade name "Exchange Realty", with his principal place of business in Ft. Lauderdale, Florida. During this period, Phyllis was a saleswoman for Exchange Realty and also ran Wholesale Homes and Apartments, Inc. (hereinafter referred to as "Wholesale Homes"). [4] During this period, Exchange Realty's books and records were maintained on the cash basis and petitioners were cash basis taxpayers. Selbia completed his formal education only through the seventh grade. Selbia was embarrassed about his lack of education and did not wish his employees or the people with whom he did business to know how little education he really had. Consequently, Selbia occasionally took home study courses and the like *219 [5] to supplement his education, but he has never studied bookkeeping or income tax return preparation. Although Selbia was generally considered by those who knew him to be a good salesman, there is some question as to whether Selbia was also a good businessman. Selbia had little understanding of bookkeeping methods or systems. Consequently, he simply relayed pertinent information to his bookkeeper and assumed it was properly handled. Similarly, Selbia had only a slight working knowledge of the Federal income tax laws and so did not participate in the preparation of petitioners' joint tax returns filed for the years in issue. Phyllis completed her formal education only through *220 the eleventh grade, [6] including a year of bookkeeping in either the ninth or tenth grade. Although Phyllis prepared petitioners' Federal income tax returns for 1969 and 1970, she never studied income tax return preparation, except for what she could learn from pamphlets put out by the Internal Revenue Service. Until about 1967 or 1968, Phyllis kept the books and records for Exchange Realty. However, as the company began to grow, petitioners decided to hire bookkeepers. Leslie Holl (hereinafter sometimes referred to as "Holl"), a bookkeeper, [7] was hired to work for Exchange Realty about October of 1969 [8] and worked there until about September of 1970. [9] Although Selbia hired Holl, the interview was conducted by, and the job offer came from, Verna Mae Eady (hereinafter sometimes referred to as "Eady"), a saleswoman and administrative assistant for Exchange Realty. Eady told Holl what his duties were to be. Holl's duties included paying the bills, writing payroll checks, making deposits, and keeping whatever records he thought fit. Holl was given nearly complete *221 freedom to perform these duties. During the time that Holl worked at Exchange Realty, Phyllis did not work there, except for the last 2 or 3 months of Holl's employment. Phyllis occasionally helped Holl keep the books at Exchange Realty, but generally only at Holl's direction. Phyllis prepared petitioners' 1969 and 1970 joint income tax returns from information supplied to her by Holl, [10] although it was often necessary for Phyllis to rewrite Holl's handwritten information to make it more legible. Neither petitioner specifically asked Holl to prepare materials for use in preparing their income tax returns. Rather, they *222 used materials Holl had prepared for Exchange Realty or on his own initiative. It was standard operating procedure at Exchange Realty that for any money that came into the office, a receipt was to be prepared and the amount entered into a receipt book. The money was then deposited in one of three bank accounts maintained by Exchange Realty at the Plantation First National Bank in Fort Lauderdale, Florida: (1) the main operating account; (2) the trust account; and (3) the escrow fund account. Funds deposited in the trust and escrow fund accounts were frequently transferred to the main operating account. Deposits to the main operating account were recorded in Exchange Realty's cash receipts and disbursements journal (hereinafter sometimes referred to as "the 1969 journal") as gross receipts, whether the funds were deposited directly to the main operating account or they were transferred to the main operating account from one of the *223 other accounts. 1. 1969 Gross Receipts -- Schedule C
69-1 [11] The 1969 Journal The 1969 journal includes in its extreme right-hand column the receipts and deposits to Exchange Realty's main operating account. On the last page of the 1969 journal, in column 30, the receipts are brought forward on a month-by-month basis and totals are determined. However, there are no entries in the total receipts column for August, November, and December on the last page of the 1969 journal. Column 30, without the receipts from the omitted months, was totalled to arrive at a gross receipts figure of $106,512.96 for Exchange Realty for 1969. This is the amount reported by Phyllis on schedule C of petitioners' 1969 tax return as gross receipts from Exchange Realty for the year. [12] *224 Respondent determined that $134,083.52 was income deposited in Exchange Realty's main operating account in 1969. [13] Some of the items recorded in the receipts column of the 1969 journal are not properly items of income subject to tax. 69-2 Miscellaneous Commissions
During the audit process, revenue agent Dan Skidmore (hereinafter sometimes referred to as "Skidmore") asked Phyllis to recalculate Exchange Realty's total commission *225 income for 1969, this time using all the files except the 1969 journal. Phyllis prepared a list using information supplied to her by Holl. Phyllis added the commissions earned by Exchange Realty, as listed on every sales contract in which Exchange Realty was involved in 1969, and calculated a total commissions amount of $99,265.86 for Exchange Realty in 1969. This amount is $7,247.10 less than the total gross receipts for Exchange Realty reported by Phyllis on petitioners' 1969 tax return. Nine of the commission items on Phyllis' list, totaling $3,684.76, had not been deposited to Exchange Realty's main operating account and, consequently, had not been recorded in the 1969 journal. 69-3 Schwartz-Kleinberg Commission Forfeiture
In May 1969, Exchange Realty acted as the broker on a proposed transaction between Ben Kleinberg (hereinafter sometimes referred to as "Kleinberg") and Robert L. Schwartz (hereinafter sometimes referred to as "Schwartz"). As part of the sale contract, dated June 18, 1969, the buyer, Kleinberg, deposited $5,000 with Exchange Realty and agreed that, if he defaulted, then the seller (Schwartz) and the broker (Exchange Realty) would retain the $5,000 deposit *226 as liquidated damages. Closing was to take place in 95 days (September 21, 1969). Kleinberg defaulted and forfeited the $5,000 deposit. Petitioners paid out $2,467.50 as liquidated damages to Schwartz's wife on December 22, 1969. Petitioners also refunded $5,000 to Kleinberg on September 25, 1969. Petitioners retained no part of the forfeited $5,000 deposit, and, in fact, sustained a $2,467.50 loss on the transaction. 69-4 Miller-Kleinberg Commission
In October 1969, Exchange Realty acted as broker in a transaction between Kleinberg as buyer and David Miller [14] (hereinafter sometimes referred to as "Miller") as trustee-seller. The transaction involved the sale of 86.645 acres of vacant land. An agreement between Miller and petitioners provided that a commission of $47,654.75 would be paid -- $24,300 at closing, and the balance when the purchase money mortgage payments were received by Miller from Kleinberg. The purchase money mortgage was payable in seven annual installments, beginning on or about September 25, 1970.An agreement between petitioners and Melvin I. Muroff (hereinafter sometimes referred to as "Muroff"), a real estate attorney, [15] provided that the commission on *227 this sale would be split between petitioners and Muroff. [16] Petitioners received $24,300 at the closing between Kleinberg and Miller. Muroff increased by $12,150 the amount of a debt already owed to his wife, Gloria Muroff, by petitioners (see 70-2 Muroff-Miller Commission,infra) in order to reflect his half of the commission which he claim he never received. See table 4, infra, and accompanying discussion. No portion of this commission appears in the 1969 journal and, thus, no portion was reported as gross receipts by Phyllis on petitioners' 1969 tax return. [17] *228 69-5 Joel Miller-Muroff Commission
Respondent determined that petitioners omitted $22,300 commission income from a 1969 transaction between Joel Miller and Muroff. At trial, respondent conceded this item in full. [18]
2. 69-6 and 70-7 Wages from S.E.A.
S.E.A. Corporation was organized to build homes and was partially owned and operated by Selbia. Phyllis had no connection with S.E.A. Corporation. At the suggestion of petitioners' accountants, Selbia was put on the S.E.A. Corporation payroll at $100 a week salary. Since Selbia had almost always been self-employed, he intended to qualify for social security benefits some day because of the F.I.C.A. taxes withheld from his wages by S.E.A. Corporation. In 1969, S.E.A. Corporation paid to Selbia $3,300 wages, from which $588.80 was withheld as income tax and $153.60 was withheld as F.I.C.A. taxes. In 1970, S.E.A. Corporation paid to Selbia $1,700 wages, from which $252 was withheld as income tax and $81.60 was withheld as F.I.C.A. *229 taxes. Petitioners did not report the $3,300 wages and the $1,700 wages on their 1969 and 1970 tax returns, nor did they claim credits for the withheld taxes. Petitioners never filed a refund claim for any of the withheld taxes. Selbia did not understand the requirement that income subject to withholding must be reported on his tax return. 3. Orange Grove -- Sale, Mortgage Note, Commission Note
In General
In 1962 petitioners acted as brokers on the sale of an orange grove to Harley Hartline (hereinafter sometimes referred to as "Hartline"). Hartline, as the buyer of the orange grove, was responsible for paying petitioners a $23,750 commission. In lieu of this commission, petitioners accepted from Hartline an 8.636-percent interest in the orange grove. [19] *230 Hartline's accountant annually sent to petitioners a completed Schedule F (Schedule of Farm Income and Expenses) for the years 1962 to 1969. Some years the orange grove made money and some years it lost money. From 1962 to 1969, on balance it lost a little money (see n. 21, infra). Selbia paid his share of the overall net loss when the orange grove was sold. In May 1969, the orange grove was sold to Muroff. Since petitioners acted as the brokers on this transaction, they were entitled to (1) a portion of the sales proceeds, in exchange for their 8.636-percent interest in the orange grove, and also (2) a commission on the sale of Hartline's 91.364-percent interest in the orange grove. 69-7 Capital Gain
For their 8.636-percent interest in the orange grove, petitioners were entitled to realize the amounts shown in table 1. Table 1
Cash at closing
$ 8,401.11
Mortgage from Muroff
43,493.66
Cash for Selbia's interest
690.88
in acre retained by Hartline
$52,585.65
Less: selling expenses
[20] 6,469.53
$46,116.12
Petitioners did not actually receive any of the $8,401.11 *231 cash at the closing, since their $1,931.58 excess of cash over selling expenses was offset against petitioners' $10,096.22 [21] debt to Hartline, leaving a balance owed by petitioners to Hartline of $8,164.64. Muroff's mortgage note to petitioners required payments over 10 years (beginning in 1970) and bore interest at 6 percent per year. In May 1969, petitioners discounted the mortgage to Mary Malooley (hereinafter sometimes referred to as "Malooley") for $38,000. Muroff handled the discounting of the mortgage to Malooley, since Malooley was Muroff's client. Petitioners received a check from Malooley in the amount of $17,000. This check was deposited to the Exchange Realty trust account on October 14, 1969. Another $22,000, received by Muroff from Malooley, was credited by Muroff to a debt owed by petitioners to Gloria Muroff. See 70-2, infra.[22] *232 Petitioners did not report on their 1969 tax return any gain on the sale of the orange grove. 69-10 Operational Loss
Petitioners are entitled to deduct $361.68 as their share of the 1969 loss from the operation of the orange grove. Petitioners failed to deduct any such loss on their 1969 tax return. This $361.68 is included in the $10,096.22 debt to Hartline that was paid in part on the sale of the orange grove. (See n. 21, supra.) Commission -- 1969
Exchange Realty was to receive a broker's commission of $60,363.20 for petitioners' services regarding the Hartline's interest in the May 1969 orange grove sale. In accordance with Exchange Realty's agreement with Hartline, petitioners received, on May 2, 1969, $10,000 in cash and a 10-year 6-percent note for $50,363.20. The first payment under the note was due in May 1970. Hartline's payments under the note are conditioned on his receipt of payments from Muroff under the mortgage. On their 1969 tax return, petitioners reported the $10,000 commission that they received in cash at the closing on the orange *233 grove sale; they did not report the remainder of the commission. 70-3 and 70-11 Commission -- 1970 Payment
In May 1970, Hartline was to make a payment to petitioners in the amount of $8,058.11 ($3,021.79 in interest and $5,036.32 in principal) on the commission note. Hartline also was acting as a conduit for Muroff's payments on the mortgage that petitioners had discounted to Malooley. In this capacity, Hartline was to make a payment of $6,958.99. In other words, Hartline was to make a total payment of $15,017.10, of which $6,958.99 was a mortgage payment to Malooley and $8,058.11 was a commission payment to petitioners. However, petitioners still owed Hartline $8,164.64 (see n. 21, supra, and related text), which debt Hartline offset against the $15,017.10 total payment due from him on both the mortgage and the commission. Thus, Hartline made a net payment of $6,852.46 directly to Malooley. Also petitioners' paid Malooley $106.53. [23]
On their 1970 tax return, petitioners failed to include the $5,036.32 commission income and $3,021.79 interest *234 income that Hartline used to offset petitioners' debt to him. Also, petitioners did not deduct any of their payments on this debt. [24]
70-4 Commission -- Schiff-Yesley Discount
The Hartline commission note, with a remaining principal balance of $45,326.88 ($50,363.20 original amount, less $5,036.32 principal payment, discussed in 70-3 and 70-11 Commission -- 1970 Payment,supra), was sold at a discount on May 25, 1970, to Eva Schiff (hereinafter sometimes referred to as "Schiff") and Selma Yesley (hereinafter sometimes referred to as "Yesley") for $32,000. Muroff handled the transaction both for petitioners and for Schiff and Yesley. Yesley is Muroff's sister. The entire proceeds from the sale of the Hartline note were to be received by Muroff from Schiff and Yesley. Petitioners were to receive the $32,000 discount price in the form of a $10,000 credit against a debt they owed to Gloria *235 Muroff, and $22,000 in cash. The $10,000 was credited in 1970 against the balance that petitioners owed to Gloria Muroff. As to the other $22,000, see the discussions of item 70-4 in parts I (pp. 39-40) and II (pp. 61-62) in the Opinion, infra. Petitioners failed to report this transaction on their 1970 tax return. 4. 69-9 Legal Fees
On their 1969 tax return, petitioners deducted $4,425 for legal fees. Muroff spent a great deal of time at the Exchange Realty offices. 5. 69-11 Itemized Deductions
Respondent made four adjustments to petitioners' 1969 itemized deductions, for a net adjustment increasing their deductions by $130.76. These are derivative adjustments that depend on the amount of petitioners' adjusted gross income. 6. 1970 Gross Peceipts -- Schedule C
70-1 Beecroft-Kleinberg Commission Forfeiture
In May 1969, Exchange Realty acted as the broker on a proposed real estate transaction between Kleinberg and Robert Beecroft (hereinafter sometimes referred to as "Beecroft"). As part of the sale contract, dated May 29, 1969, the buyer, Kleinberg, deposited $3,000 with Exchange Realty and agreed that, if he defaulted, then the seller (Beecroft) and the broker (Exchange Realty) *236 would retain the $3,000 deposit. Kleinberg defaulted in 1970, and Beecroft was paid $1,500 out of Exchange Realty's escrow fund account. Petitioners retained the other $1,500, but did not report it as income on their 1970 tax return. 70-2 Muroff-Miller Commission
On or about January 2, 1969, petitioners bought a 40-acre orange grove called Davie Farmettes from Muroff. After various payments and mortgage assumptions, [25] a balance of $108,000 was to be secured by a purchase money mortgage. The deed was in escrow and no note or mortgage was drawn up evidencing the $108,000 debt. At some point, Muroff transferred his interest in the $108,000 *237 debt to Gloria Muroff, his wife. Muroff and petitioners contemplated that petitioners would divide the 40 acres into 1-1/4-acre parcels and sell the parcels.They agreed that they would determine what would be the terms of the second mortgage for the $108,000 debt after they had an opportunity to see the rate and nature of petitioners' sales of the 1-1/4-acre parcels. Davie Farmettes was not a successful venture. Petitioners paid about $4,000 per acre for the property. Petitioners then paid about $1,500 per acre to develop the property. Petitioners sold the 1-1/4-acre lots for about $6,000. As a result, petitioners generally were short of cash at this time. In January 1970, petitioners acted as the broker on a $1,047,375 sale of real estate from Muroff to Miller. The normal commission on a sale of $1,047,375 was $104,737.50. Petitioners and Muroff agreed that petitioners would get half the commission and Muroff the other half ($52,368.75 each). The closing on this transaction was handled by Muroff, as Selbia was in the hospital at the time. Petitioners did not report this commission as income on their 1970 tax return. Petitioners received a warranty deed dated August 1, 1970, *238 from Muroff and Gloria Muroff, evidencing petitioners' ownership of Davie Farmettes and stating that this ownership was "SUBJECT TO * * * A purchase money mortgage of even date herewith in the original principal amount of $83,200, in favor of Gloria Muroff." Petitioners also received a partial release of mortgage from Muroff and Gloria Muroff dated November 9, 1970, which shows an amount owed to Gloria Muroff of $83,000. This figure should have been $83,200. Petitioners agreed to act as a broker on the sale of Muroff's lots at Davie West. [26] For each Davie West lot that they sold, petitioners were to be paid a commission of 10 percent of the amount by which the selling price of the lot exceeded $1,000. [27] *239 Petitioners were to receive these commissions partly in the form of deposits paid by buyers of Davie West lots and partly in the form of credits against their debt to Gloria Muroff. The deposits retained by Exchange Realty on the sale of a Davie West lot often were not enough to cover the commissions due petitioners on the transaction. On March 2, 1971, Selbia and Muroff agreed that petitioners still owed $53,319 to Gloria Muroff on the Davie Farmettes mortgage. On March 18, 1971, Selbia and Muroff agreed that petitioners still owed $42,430 to Gloria Muroff on the David Farmettes mortgage and that "this supersedes any previous accounting". 69-8 Orange Crop
Petitioners agreed to buy an orange grove, called Davie Farmettes, from Muroff for $160,000 (see 70-2 Muroff-Miller Commission,supra). This price was then increased by $8,000, the amount for which Muroff had sold an orange crop. Petitioners paid $9,000 of the total by sale of an orange crop on Davie Farmettes. In the notice of deficiency, respondent determined that petitioners had unreported ordinary income of $9,000 on account of this transaction. The parties have stipulated that respondent concedes this adjustment. 7. 70-5 Land Received for Services
On March 10, 1970, Muroff deeded a parcel of land to petitioners in return for Selbia's services rendered in connection with his attempt to obtain a zoning change. At the time, *240 the fair market value of the land was $17,200. On their 1970 tax return, pursuant to Muroff's advice, petitioners reported a $17,200 long-term capital gain on schedule D, and attached a statement that read "received property for services rendered on getting zoning[;] Valuation on 1.72 acres at $10,000 per acre = $17,200.00." Petitioners still held the property at the end of 1970. 8. 70-6 Other Commission Income
Apart from the commission income items discussed supra, petitioners had $43,276.87 commission income in 1970. On their 1970 income tax return, petitioners reported $45,594.87 commission income. 9. 70-8 Long-Term Capital Gains
In October 1970, petitioners sold for $11,500 a parcel of land located at 6301 S.W. 39th Court, Ft. Lauderdale, Florida, (hereinafter sometimes referred to as "the 39th Court property"). The sum of petitioners' basis and their expenses of sale is $7,843. Petitioners realized a gain of $3,657 from this sale. [28]
In August *241 1970, petitioners sold for $40,000 their residence, a parcel of land located at 5525 Southwest 40th Avenue, Ft. Lauderdale, Florida (hereinafter sometimes referred to as "the 40th Avenue property"). The sum of petitioners' basis and their expenses of sale is $37,364.95. Petitioners realized a gain of $2,635.05 from this sale. [29]
On schedule D of their 1970 tax return, petitioners claimed a $29,000 long-term capital loss deduction as their share of a loss suffered by Wholesale Homes. The subchapter S election for Wholesale Homes was not timely. (See n. 4, supra.) 10. 70-9 Itemized Deductions
Respondent made two adjustments to petitioners' 1970 itemized deductions for a net adjustment decreasing their deductions by $172.23. 11. 70-10 Interest Expense
On their 1970 tax return, petitioners deducted $1,783.64 of interest in connection with two sales of real estate. These interest expenses were deducted as expenses of the sales, *242 reducing the amounts of petitioners' long-term capital gains. (See n. 28 and 29, supra.) The parties agree that these interest expenses are separately deductible from ordinary income. 12. Petitioners' Tax Returns
Petitioners' 1969 tax return was filed in July 1970; their 1970 tax return was filed on or about April 15, 1971. The notice of deficiency was mailed to petitioners on April 13, 1977, more than 3 years after the filing of petitioners' tax returns for 1969 and 1970. On their 1970 tax return, petitioners reported the gross income (see n. 45, infra) items listed in table 2. Table 2
Wages (Wholesale Homes)
$3,225.00
Interest
55.06
Gross receipts (Exchange Realty)
45,594.87
Gross sale price (real estate sales)
$7,256.81
11,500.00
40,000.00
17,200.00
75,956.81
Rents
4,458.97
Mortgages
6,885.71
$136,176.42
13. Later Events
Respondent began his investigation of petitioners' 1969 and 1973 tax returns in 1971. Selbia felt proud that his real estate company had become big enough to be audited. By 1972, special agents were involved in the investigation. Petitioners cooperated fully with revenue agent Skidmore, and special agents Salvatore "Ted" Sparacino and Orin Oakes (hereinafter sometimes referred *243 to "Oakes"). Not only was Skidmore furnished with an office and a desk at Exchange Realty, but all the Exchange Realty employees were instructed by Selbia to give Skidmore everything he asked for. At Skidmore's suggestion, Selbia hired certified public accountants to assist in straightening out Exchange Realty's books. When petitioners moved from Fort Lauderdale to Chiefland, Florida, in August 1971, all of petitioners' files were locked in a room to which only Skidmore and petitioners' current accountant had keys. In 1974, respondent's Intelligence Division recommended criminal prosecution of defendants for income tax evasion for 1969 and 1970. In 1975, respondent referred the matter to the Department of Justice. Both petitioners were indicted for criminal tax evasion for 1969 and 1970. Phyllis was tried in 1976 and acquitted. Selbia's indictment was quashed. OPINION Petitioners have properly raised in their petition the affirmative defense of the statute of limitations under section 6501(a). Rule 39. [30]
In general, section 6501[31] *245 bars assessment of an income tax deficiency *244 more than 3 years after the later of (1) the date the tax return was filed or (2) the date the tax return should have been filed. If the taxpayer proves that the notice of deficiency was mailed more than 3 years after the later of the filing or the due date, then respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. Farmers Feed Co. v. Commissioner,10 B.T.A. 1069 (1928). See Miami Purchasing Service Corp. v. Commissioner,76 T.C. 818, 822 (1981). In the instant case, petitioners have pled the statute of limitations as an affirmative defense in their petition and have proven that their tax returns for 1969 and 1970 were filed more than 6 years before the notice of deficiency was mailed (April 13, 1977) in the case of their 1969 tax return, and more than 5 years in the case of their 1970 return. Respondent concedes as much. Respondent contends that the instant case falls within the exceptions to the general period of limitations set forth in section 6501(c)(1) (for both 1969 and 1970) and section 6501(e)(1)(A) (for 1970). The parties have stipulated that, if respondent does not prove that petitioners were fraudulent, then the statute of limitations bars the assessment and collection of any deficiency for 1969. Similarly, the parties have stipulated that if respondent does not prove either fraud or that petitioners omitted an amount in excess of 25 percent of the gross income stated in their return for 1970, then the statute of limitations bars the assessment and collection of any deficiency for 1970. We will deal first with the fraud issue, as it pertains to both 1969 and 1970, and then *246 the substantial omission of income issue as it pertains to 1970. I. Statute of Limitations -- Fraud
Respondent raises the exception to the general period of limitations set forth in section 6501(c)(1)[32] *247 . Respondent has the burden of proving the applicability of this exception. Farmers Feed Co. v. Commissioner,supra.This burden is the same as that which respondent bears under section 6653(b). Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (CA3 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner,39 T.C. 988, 996 (1963). To carry this burden for a year, respondent must prove, by clear and convincing evidence, that petitioners have an underpayment of tax for that year, and that some part of that underpayment is due to fraud. Section 7454(a) [33]; Rule 142(b); e.g., Carter v. Campbell,264 F.2d 930, 936 (CA5 1959); Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105, 114 (1969). In carrying his burden, respondent may not rely on petitioners' failure to meet their burden of proving error in respondent's determinations as to the deficiencies (e.g., Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982), and cases there cited). For purposes of the addition to tax under section 6653(b), fraud is not imputed from one spouse to another; in the case of a joint return, respondent must prove fraud on the part of each spouse. Section 6653(b) (last sentence) (which now appears as sec. 6653(b)(4)); Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (CA1 1972); Stone v. Commissioner,56 T.C. at 227-228. However, respondent's proof of fraud by one spouse prevents the running of the statute of limitations *248 under section 6501(c)(1) with regard to the other spouse. Hicks Co. v. Commissioner,56 T.C. at 1030; Stone v. Commissioner,56 T.C. at 228; see Goodman v. Commissioner,71 T.C. 974, 978 (1979). Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Drieborg v. Commissioner,225 F.2d 216, 219-220 (CA6 1955), affg. in part and revg. in part an unreported Memorandum Opinion of this Court; Estate of Stein v. Commissioner,25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner,250 F.2d 798 (CA2 1958). The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Webb v. Commissioner,394 F.2d 366, 379 (CA5 1968), affg. a Memorandum Opinion of this Court [34]; Stone v. Commissioner,56 T.C. at 224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). In order to establish fraud, respondent must show that the taxpayer intended to evade taxes, which the taxpayer knew or believed he or she owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of the taxes. E.g., Webb v. Commissioner,394 F.2d at 377; Powell v. Granquist,252 F.2d 56, 60 (CA9 1958); *249 Danenberg v. Commissioner,73 T.C. 370, 393 (1979); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence. Powell v. Granquist,252 F.2d at 61; Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (CA8 1978); Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). In the notice of deficiency, respondent made many adjustments to petitioners' taxable income, each of which increased petitioners' income tax liability for either 1969 or 1970. Viewing the record as a whole, as conclude that respondent has failed to prove fraud by clear and convincing evidence, for either 1969 or 1970, by either Selbia or Phyllis. Respondent points to the following items as support for his contentions that petitioners' income tax returns for 1969 and 1970 were fraudulent with the intent to evade tax: 1969
69-1 Petitioners knew that 3 months' gross receipts ($27,570.56; i.e., $134,083.52 minus $106,512.96 (see text at nn. 12 and 13, supra)) had been omitted from schedule C of their 1969 tax return. 69-2 Petitioners knew about *250 additional commissions ($3,684.76) that were not deposited to the main account of Exchange Realty or reported as income. 69-3 Petitioners retained, but did not report, $2,500 of a $5,000 deposit forfeited by Kleinberg. 69-4 Petitioners were entitled to retain, but did not report, $12,150 of a $24,300 commission received at a closing. 69-6 Petitioners fraudulently failed to report $3,300 received by Selbia from S.E.A. Corporation. 69-7 Petitioners fraudulently failed to report a $20,631.27 capital gain from the sale of their 8.636-percent interest in an orange grove. 69-9 Petitioners knew that the amount of a $4,425 claimed legal fees deduction could not have been spent for legal fees. 1970
70-1 Petitioners retained, but did not report, $1,500 of a $3,000 deposit forfeited by Kleinberg. 70-2 Petitioners received a credit, for a $52,368.75 commission, against an outstanding debt balance owed to Gloria Muroff. Petitioners failed to report this amount as income. 70-3 and 7-11 Petitioners knew they had received payment on a commission receivable ($5,036.32) plus interest ($3,021.79) by way of a credit from Hartline on a debt owed to him by petitioners, yet they failed to report this amount *251 as income. 70-4 Petitioners discounted a commission receivable to Schiff and Yesley and failed to report the proceeds received in the form of a $10,000 credit against the debt balance owed by petitioners to Gloria Muroff, and $22,000 in cash. 70-7 Petitioners fraudulently failed to report $1,700 received by Selbia from S.E.A. Corporation. Although our focus is on the foregoing items, we also take into account the other adjustments since a determination of fraud is to be based on the record as a whole. 69-1 and 69-2
On the one hand, it is evident that petitioners omitted 3 months' worth of receipts from the $106,512.96 gross receipts they reported on their 1969 tax return. On the other hand, it is evident that the briefest glance at the 1969 journal would show this omission. See Iley v. Commissioner,19 T.C. 631, 635 (1952). The parties have stipulated that "There were numerous deposits included in taxable income that should not have been." When Skidmore asked Phyllis to calculate Exchange Realty's commission income for 1969 without using the 1969 journal, Phyllis prepared a schedule totalling only $99,265.86. Respondent's special agent (Oakes) testified that petitioners provided respondent *252 with whatever documentation petitioners had. Respondent has not pointed us to "clear and convincing evidence" that petitioners' correct 1969 commission income exceeded the amount petitioners reported on their 1969 tax return. Respondent has merely shown that the income might be more; on the other hand, it might be less.Respondent has persuaded us that petitioners were negligent, but has failed to persuade us by clear and convincing evidence that there was an underreporting of commission income which gave rise to a 1969 underpayment of tax due in whole or in part to fraud on the part of either petitioner. 69-3, 69-4, and 69-5
In the notice of deficiency, respondent determined three additional items of 1969 commission income, as shown in table 3. Table 3
Amount of Commission
Transation
Income
Schwartz-Kleinberg
$ 2,500
Miller-Kleinberg
12,150
Joel Miller-Muroff
22,300
$36,950
Schwartz-Kleinberg. -- Respondent points out that (1) the sale contract provides for Kleinberg's $5,000 to be liquidated damages to Exchange Realty and Schwartz, (2) Kleinberg forfeited the $5,000, and (3) Exchange Realty paid only $2,467.50 to Schwartz. This, respondent contends, supports his $2,500 commission income adjustment *253 and petitioners' omission of this item from income is an indicium of fraud. Respondent makes to attempt to explain away the significance of Exchange Realty's payment of $5,000 to Kleinberg just 4 days after Kleinberg forfeited the $5,000 in question. Respondent relies on a Kleinberg 1973 affidavit that he forfeited the $5,000, but there is no dispute on that point. The question is whether petitioners, through Exchange Realty, refunded the amount to Kleinberg. Kleinberg's affidavit does not discuss any possible refund. Kleinberg's affidavit refers to two other letters by him, dated January 9, 1970, but does not describe the contents of these letters. The record does not include these January 9, 1970, letters. The only evidence as to the claimed refund is Selbia's testimony, backed up by the stipulated check. We conclude, and we have found, not only that petitioners did not have a $2,500 profit on the Schwartz-Kleinberg transaction, but rather they sustained a $2,467.50 loss on the transaction. There was no underpayment of income due to fraud on account of the Schwartz-Kleinberg transaction. Indeed, this transaction is evidence that contradicts fraud generally, because it shows *254 that petitioners overreported income because they did not deduct the loss sustained on the transaction. Miller-Kleinberg. -- Petitioners received $12,150 commission income (see n. 17, supra) from this transaction in 1969 and omitted this income from their 1969 tax return. They do not explain how this could have occurred, except for their general explanation of sloppiness of records. Under the circumstances, this omission is not itself clear and convincing evidence of fraud, but it is an indicator of fraud, to be weighed with others in evaluating the record as a whole. Joel Miller-Muroff. -- Respondent has conceded that he erred as to this $22,300 item -- it is not even a proper adjustment to income, much less an indicator of fraud. In evaluating the three asserted 1969 commission income items (totalling $36,950), we conclude that respondent has a good argument on one ($12,150) and is totally in error as to the other two ($24,800). The one item as to which respondent has a good argument will be taken into account in evaluating the record as a whole, but is not itself conclusive. See, e. g., Merritt v. Commissioner,301 F.2d 484, 487 (CA5 1962), affg. a Memorandum Opinion of this *255 Court; [35]Stratton v. Commissioner,54 T.C. at 284; Otsuki v. Commissioner,53 T.C. at 106. 69-6 and 70-7
Petitioners concede that they omitted from their 1969 and 1970 tax returns Selbia's wages from S.E.A. Corporation in the amounts of $3,300 and $1,700, respectively. Petitioners also failed to claim credit for income tax withholding in the amounts of $588.80 and $252, respectively. It is not clear whether these omissions from income result in underpayments of tax for either 1969 or 1970. [36] Selbia has been self-employed all of his working life, with the exception of this employment by S.E.A. Corporation. We conclude that respondent has persuaded us that there was an underreporting of Selbia's wages income for 1969 and for 1970, but he has failed to persuade us by clear and convincing evidence that this underreporting gave rise to an underpayment of tax for either year due in whole or in part to fraud on the part of either petitioner. 69-7, *256 69-10, 70-3, 70-4, and 70-11
In lieu of a $23,750 commission earned in 1962 or 1963 (see n. 19, supra), petitioners accepted an 8.636-percent interest in an orange grove bought by Hartline. In May 1969, the orange grove was sold to Muroff. For petitioners' equity interest, they were entitled to receive cash of $8,401.11 (which was offset against selling expenses and a debt owed by petitioners to Hartline) and they received a $43,493.66 mortgage from Muroff which was subsequently discounted to Malooley for $38,000. Petitioners received the discount proceeds in the form of a credit of $22,000 against a debt owed by petitioners to Gloria Muroff, and $17,000 cash. (See n. 22, supra, for comments on the arithmetic of $17,000 plus $22,000 equals $38,000.) Also, petitioners were compensated for their brokerage services on the May 1969 transaction, by receiving $10,000 in cash and a note for $50,363.20. The first payment under the note was due in 1970. On their 1969 tax return, petitioners reported the $10,000 cash as commission income, but did not report Hartline's note and did not report anything on account of the sale of their equity interest in the orange grove. In May 1970, Hartline *257 made his first payment under the note ($3,021.79 interest and $5,036.32 principal) by applying the entire payment against petitioners' debts to him. (See n. 21, supra, and related text.) Also, Hartline retained $106.53 of Muroff's mortgage payment (which should have been passed on to Malooley) and applied that against petitioners' debts to Hartline. Petitioners thereupon made up for the shortfall to Malooley by paying her $106.53. On their 1970 tax return, petitioners did not include any income or take any deduction on account of the foregoing. Later in May 1970, Muroff arranged for petitioners to discount Hartline's note (remaining face value of $45,326.88) to Schiff and Yesley (Muroff's sister) for $32,000. Muroff acted for petitioners as well as for Schiff and Yesley. Petitioners received $10,000 of the $32,000 by having it applied against petitioners' debts to Gloria Muroff. Petitioners were to receive the remaining $22,000 of the $32,000 in cash. On their 1970 tax return, petitioners did not include any income or take any deduction on account of the foregoing. Respondent contends that petitioners fraudulently omitted to report their 1969 capital gain on the orange grove *258 sale. (Respondent does not dispute petitioners' 1969 treatment of the commission, i.e., reporting the $10,000 cash and not reporting the $50,363.20 note.) Respondent contends that petitioners fraudulently omitted to report the $3,021.79 interest and $5,036.32 commission that Hartline paid to petitioners on the note in 1970 (by crediting these amounts against petitioners' debts to Hartline). Respondent contends that petitioners fraudulently omitted to report the $32,000 that petitioners received in 1970 for the Hartline note. Petitioners concede that they should have reported their 1969 capital gain on the orange grove sale, but contend that respondent substantially overstated the gain by failing to allow for petitioners' $23,750 basis in their equity interest in the orange grove. They contend that their failure to report any such gain was "simply because of an oversight" -- i.e., Holl's failure to advise petitioners to report this gain. Petitioners concede that they should have reported the $3,021.79 interest and $5,036.32 on their 1979 tax return; but contend that their debt to Hartline (against which these amounts were credited) "was completely composed of expenses which would *259 have been deductible by the Petitioners when paid." Petitioners also contend that the $106.53 they paid to Malooley was, in effect, also paid to close out their debts to Hartline. Accordingly, petitioners conclude, there is no fraud and no underpayment due to this transaction, because full reporting of the transaction would have shown $8,058.11 of additional includible income and $8,164.64 of additional deductible expenses. As a result, petitioners' errors caused an overpayment and not an underpayment. Finally, as to the discount of the note, petitioners maintain that they never received the $22,000 cash and they never received the $10,000 credit (since they had already overpaid Muroff on the Davie Farmettes mortgage). Clearly, petitioners' omission of their orange grove capital gain from their 1969 tax return resulted in an underpayment for 1969, whether the omission was $20,631.27 (as respondent contends) or $8,436.23 (as petitioners contend). [37] This omission will be taken into account in evaluating the record as a whole, but is not itself conclusive. We also take into account the fact that petitioners, as cash basis taxpayers, were entitled to deduct the $1,931.58 that was *260 applied against their debt to Hartline. Petitioners failed to claim this deduction, which arose from the same sale as the long-term capital gain that they failed to report. It is true, as respondent contends, that petitioners failed to report the Hartline 1970 payment of principal and interest on their 1970 tax return. However, they also failed to deduct the related 1969 farm loss ($361.68) and the related 1970 deduction for payment of their debts to Hartline. All the components of this debt appear to be deductible when paid by cash basis taxpayers such as petitioners. See note 21, supra. The very act by Hartline *261 that gave rise to the income (application of his payment to petitioners' debt) also gave rise to petitioners' entitlement to a deduction. If petitioners had reported these transactions on their tax returns, and had done so properly, their additional allowable deductions would have exceeded their additional includible income. Thus, items 70-3 and 70-11 not only fail to support respondent's fraud case, but rather they significantly diminish that case, for they show that petitioners' inadequate understanding of the law and of basic accounting concepts seems to have pervaded both their records and their tax returns. The Schiff-Yesley purchase of the Hartline note presents us with a mystery. In May 1970, this note had a remaining face value of $45,326.88. Nine more equal annual payments were to be made, together with 6-percent interest on the unpaid balance each year. Petitioners transferred this note to Schiff and Yesley. Respondent's case as to the proceeds of petitioners' sale to Schiff and Yesley rests primarily on Muroff's testimony. Muroff testified that petitioners discounted the note because the note bore little or no interest. Yet, the note (which arose from the 1969 orange *262 grove sale) bore the same rate of interest as the mortgage that Muroff was paying on account of his purchase of the orange grove from Hartline, presumably an arm's-length transaction. Muroff testified that the note had a weakness in that it depended on payments of the underlying mortgage obligation. Yet Muroff was the one who was obligated to make the underlying mortgage payments. Was Muroff advising petitioners that the note was not safe because Muroff might not honor his mortgage payment obligation? In the discount to Schiff and Yesley, Muroff represented both sides to the transaction, and the side opposite to petitioners included Muroff's sister (Yesley). We wonder how much help Muroff provided petitioners. Finally, we know that Muroff received $10,000 of the proceeds, but no one seems to be able to show what happened to the other $22,000. In particular, Muroff's testimony about the transaction as a whole leads us to conclude that his claim that petitioners received the $22,000 is less likely to be true than petitioners' claim that they did not receive the $22,000. We conclude that this third act of the orange grove tale does not furnish clear and convincing evidence of an *263 underpayment of petitioners' 1970 income tax due to fraud. Indeed, we conclude that it is doubtful that even a preponderance of the evidence points to an underpayment due to fraud. 69-9
On their 1969 income tax return, petitioners claim a deduction of $4,425 for legal fees. On brief, petitioners assert that the correct deduction for legal fees, paid to Muroff, is $6,425. Respondent asserts that petitioners have never paid legal fees to Muroff. Petitioners do not make any effort to explain how they arrived at the $4,425 amount set forth in their tax return. The 1969 journal shows, under the "Office exp." column, only one item designated "Legal Fees". This item appears to be the same as a stipulated Exchange Realty check, dated May 6, 1969, to Muroff for $1,425. On the check is the notation "Hartline-Kleinberg". Selbia testified that the check "was his [Muroff's] fee for handling this [Hartline-Kleinberg] transaction." Petitoners do not tell us what the Hartline-Kleinberg transaction was. Muroff testified that he did not have any "independent recollection" of what the check was for.He testified that petitioners never paid him legal fees, that he performed legal services for petitioners *264 without charge (except that he occasionally billed them for his costs) because "in this period of time Stone was a catalystic [sic] agent for producing many thousands of dollars of profit for me so this was by way of reciprocation that I took care of several items for him." Petitioners have not directed our attention to any other item or items which might account for the remaining $3,000 of the deduction they claimed on their tax return. [38] Instead, they maintained at the start of the trial that they are entitled to deduct a total of $6,425 as legal fees, and focussed on a stipulated Exchange Realty check, dated October 14, 1969, to Muroff for $5,000. On the check is a notation which appears to be "change", but which Selbia testified is "charge". Selbia further testified that he paid $5,000 to Muroff for Muroff's services in the May 1969 discount of Muroff's $43,493.66 mortgage to Selbia arising out of Muroff's purchase of the orange grove from Hartline and Selbia. Muroff testified that the $5,000 check was related to the Malooley discount transaction but was not a payment for legal services. Muroff testified that the $5,000 check was an offset to two $500 checks from himself to *265 Malooley and a $4,000 check to either petitioners or Malooley. Muroff testified that this "was a very uncommon transaction" and that that is why he was able to recollect it so long after the event. In sum, petitioners may be entitled to little or none of their claimed legal fees deduction -- or to more than they claimed. Clearly petitioners are not entitled to the precise deduction that they claimed. Each side presented some evidence on the point, but neither side's evidence is persuasive. We are left with a puzzlement, and so we hold that respondent has failed to persuade us by clear and convincing evidence that petitioners' treatment of their legal fees deduction produced an underpayment that is due to fraud. 70-1 *266 In 1970, Kleinberg again (see discussion under 69-3,supra) forfeited a deposit which was to be divided between the seller (Beecroft) and petitioners as liquidated damages. The forfeited deposit this time was $3,000. Petitioners assert that they retained no part of this $3,000 deposit. Petitioners introduced a cancelled check for $1,500 drawn on Exchange Realty's escrow account, with Robert and Ethel Beecroft as payees. We have found that petitioners retained the other $1,500 as liquidated damages and that they did not report this $1,500 on their 1970 tax return. Under the circumstances, this omission is not itself clear and convincing evidence of fraud, but it is an indicator of fraud, to be weighed with others in evaluating the record as a paid whole. 70-2
On or about January 2, 1969, petitioners bought a 40-acre orange grove called Davie Farmettes from Muroff. As a result, and after a transfer of the underlying obligation, petitioners owed $108,000 to Gloria Muroff. In January 1970, petitioners earned a commission of $52,368.75 on a transaction between Muroff and Miller. Petitioners received a warranty deed dated August 1, 1970, from Muroff and Gloria Muroff evidencing the ownership *267 of Davie Farmettes subject to a purchase money mortgage of $83,200 in favor of Gloria Muroff. Respondent maintains that petitioners received their commission from the transaction between Muroff and Miller in the form of a $52,368.75 credit against the outstanding debt balance owed by petitioners to Gloria Muroff. [39] See table 4, infra.
Petitioners assert that they did not receive the $52,368.75 commission in 1970; rather, that Muroff was to pay the commission in seven annual installments, beginning in 1973. They contend that the memorialized debt balance of $83,200 is a result of having received credit for sales commissions earned from selling Muroff's lots at Davie West. See table 5, infra.
Table 4 shows respondent's schedule of the running balance (rounded to the nearest dollar) owed by petitioners to Gloria Muroff on Davie Farmettes. Table 4
(Respondent's Schedule)
Increase
Decrease
1969
in Debt
in Debt
Balance
Second Mortgage to Muroff
$108,000
House Pads & Roads
$24,782
132,782
Advance to Ft. Lauderdale Nat'l Bank
10,000
142,782
Miller-Kleinberg Commission
12,150
154,932
Interest
8,100
163,032
Malooley Discount
$22,000
141,032
1970
Miller-Muroff Commission
52,368
88,663
Schiff-Yesley Discount
10,000
78,663
Interest to Muroff
2,521
81,184
Lot 28 Davie West
2,400
83,584
Oct. 1970 Signed Note
83,200
1971
Interest
1,813
85,013
Interest
3,120
88,133
Saltray Supersedeas Bond
4,606
92,739
Hotlick Payment
61
92,800
Lots Discounted to Muroff
39,420
53,380
Lots Discounted to Muroff
10,950
42,430
House Pads & Roads
10,451
52,881
Interest
519
53,400
Interest
1,917
55,317
Nardy Costs
134
55,451
Commission Due Stone
4,845
50,606
Mortgage to Doblschultz
50,500
106
*268 Table 5 shows Phyllis' schedule of the running balance (rounded to the nearest dollar) owed by petitioners to Gloria Muroff on Davie Farmettes. Table 5
(Phyllis' Schedule)
Increase
Decrease
1969
In Debt
In Debt
Balance
Balance due Muroff
$108,000 (No deed given; no mortgage signed)
Commissions on Sales of Davie West Lots
Laromore
$1,100
106,900 McConn
1,190
105,710 Lawyer
800
104,910 Compalini
700
104,210 Johnson
5,000
99,210 Knap
5,000
94,210 Molly Wein Mortgage
10,000
84,210 1970
Commissions on Sales of Davie West Lots
Sontora
815
83,395 Jones
890
82,505 Hennick
790
81,715 Sontora
125
81,590 Paragini
700
80,890 Montavella
1,300
79,590 Dominquez
650
78,940 Wagner
450
78,490 Vendetts
700
77,790 Ekstein
600
77,190 Stockton
1,200
75,990 Angilio
700
75,290 Burkhart
500
74,790 Interest for 1969 and 1970
$8,410
83,200 (July 1970, Mortgage & Note Signed.
Deed Given)
House Pads & Roads
25,000
108,200 Hartline Commission
10,000
98,200 Cannon
2,400
100,600 1971
Cash
1,600
99,000 Commission on Sale of Lot 20
990
98,010 Lots Discounted to Muroff
39,420
58,590 Lots Discounted to Muroff
10,950
47,640 Commissions on Sales of Davie West Lots
Lloyd
1,190
46,450 Hally
990
45,460 McConn
890
44,570 Lavoie
825
43,745 Burkhart
500
43,245 Dobleshultz Mortgage
50,500
(7,255)
Interest in 1971
1,185
(6,070)
Commissions on Sales of Davie West Lots
Mathely
890
(6,960)
Hally
810
(7,770)
Boher
1,250
(9,020)
*269 We have difficulties in fully accepting either side's version of the events, particularly with regard to the $52,368.75. What is established is that petitioners' debt to Gloria Muroff, was reduced by a net of $24,800 between January 2, 1969, and August 1, 1970; it was further reduced to $53,319 by March 2, 1971, and to $42,430 by March 18, 1971. Both of the 1971 agreements between petitioners and Muroff show what credits and charges were taken into account in reducing the debt from the August 1, 1970, level to the March 2, 1971, level or the March 18, 1971, level. However, neither side has produced evidence of a similar agreement showing how the August 1, 1970, level of $83,200 was reached. Petitioners' record-keeping was thoroughly inadequate. Muroff, a lawyer, coule be expected to be aware of the importance of keeping records, especially with regard to a substantial open account. As early as December 1972, respondent's special agent was conducting an investigation of petitioners' income taxes for the years here in issue. Presumably, Muroff's records would still have been available at that time. The only exhibit which appears to be more-or-less contemporary, and which supports *270 respondent's version of the events, is a document in Holl's handwriting which shows in a sketchy fashion how the balance of the debt was reduced to $78,663.25. In constructing what we have set forth as table 4, supra, respondent then adds "Interest to Muroff 2521.60" and "Lot 28 Davie West 2400 --" to the $78,663.25, which results in a balance of $83,584.85. The next entry on this schedule is the agreement that the debt balance is $83,200, with no explanation of the $384.85 discrepancy. Petitioners counter with a document that Phyllis had prepared contemporaneously from information that Holl had passed on to her from Muroff. This document shows the balance of the debt being reduced to $74,790. Phyllis then arrives at the October 1, 1970, level of $83,200 by adding "Interest for 69 & 70 8,410.00" to the $74,790. In October 1969 the Miller-Kleinberg transaction poroduced a $47,654.75 commission, of which $24,300 was paid at the closing. This commission was to be split evently between petitioners and Muroff. Petitioners failed to report any part of the 1969 receipt of this commission. Petitioners claim that they paid Muroff $12,150; they concede that the remaining $12,150 is taxable *271 to them. Respondent seems to contend that petitioners kept the entire $24,300 yet respondent contends only that $12,150 was income to petitioners. If respondent's notice of deficiency adjustment is correct, that petitioners had $12,150 commission income from the Miller-Kleinberg transaction, then petitioners are correct in their contention that they paid the remaining $12,150 to Muroff, and Muroff should not have debited the debt. On the other hand, respondent's schedule takes into account Muroff's claimed debit of the $12,150. If that treatment is correct, then petitioners must have kept the entire $24,300 and respondent should have adjusted petitioners' income by the full amount. Thus, respondent's schedule is inconsistent with the notice of deficiency in its treatment of Muroff's share of the 1969 portion of the commission from the Miller-Kleinberg transaction; however, respondent's schedule is consistent with our findings on this point. Petitioners' schedule does not show the $12,150 item at all. We have found, and petitioners do not dispute, that in May 1969 petitioners discounted to Malooley a $43,493.66 mortgage that they had acquired earlier in the year, that Muroff kept *272 $22,000 out of the proceeds of that discounting, and that he applied this $22,000 as a credit against the debt. This application to the debt is memorialized in an agreement signed by Selbia and Muroff, and dated October 14, 1969. Phyllis' schedule does not give effect to this credit. Respondent's schedule takes this credit into account. Respondent's schedule shows a 1969 debit of $24,782, to reflect Muroff's business' charge for roads and house pads (concrete slabs on which purchasers of Davie Farmette lots would be expected to build their houses). Phyllis' schedule shows a $25,000 debit for this purpose, but shows it as a 1970 adjustment, made after the striking of the $83,200 balance. Phyllis' adjustment is inconsistent with the Muroff-Selbia agreements of March 2, 1971, and March 18, 1971. Further, on brief petitioners contradict Phyllis' schedule by contending that the "amounts listed in the 'Increase in Debt', column for house pads or roads that Broward Land Clearing Co. allegedly constructed on the Davie Farmettes property * * * were never owed by petitioners to Mr. Muroff, as Broward Land Clearing Co. never completed any roads and only two house pads on the Davie Farmettes *273 Property." We have found, and both sides agree, that on May 25, 1970, petitioners sold the Hartline note to Schiff and Yesley for $32,000. There is a dispute as to whether Muroff kept the entire $32,000 or paid $22,000 over to petitioners. (See 69-7, 69-10, 70-3, 70-4, and 70-11,supra.) However, everyone agrees that Muroff kept $10,000 and credited this amount against the debt. Presumably this would have been done at or shortly after the May 25, 1970, date of the Schiff-Yesley transaction and, thus, well before the October 1970 agreement that the debt balance was $83,200. Respondent's schedule is consistent with our findings in that it shows the $10,000 credit as one of the 1970 adjustments taken into account in arriving at the November 9, 1970, agreement for an $83,200 balance. Phyllis' schedule is inconsistent with our findings in that it shows the $10,000 as a 1970 adjustment after the $83,200 balance. Phyllis' schedule shows credits for commissions earned by petitioners on the sales of Muroff's Davie West lots; respondent's schedule does not show any such credits. Muroff testified that these commissions were not credited to petitioners' debt because they were paid "up front" *274 in the form of a deposit by the buyer (and retained by Exchange Realty) on each Davie West lot sold. However, we note that, contrary to Muroff's testimony in this regard, the deposits retained by Exchange Realty on the sale of a Davie West lot often were not enough to cover the commissions due petitioners on the transaction. Also, for many of the commissions claimed as credits by petitioners there is no corresponding receipt in the record evidencing that petitioners also received a deposit. Similarly, for many of the deposits received by petitioners there is no corresponding claims that the commission was also a credit against their outstanding debt. In other words there is little overlap between the commissions claimed by petitioners to have been credited against their outstanding debt balance and the commissions claimed by Muroff to have already been paid to petitioners in the form of retained deposits. We find additional support for petitioners' contention that some of their commissions from Davie West sales were credited to their Davie Farmettes balance, in a statement by Eady, an Exchange Realty salesperson, that she was not sure she ever received all the commissions due her *275 on the sale of Davie West lots "due to the fact that Mr. Muroff was crediting Stone's account." If we were to modify respondent's schedule by factoring in the Davie West commission credits, then respondent's schedule, as so modified, would show a debt balance significantly lower than the agreed-upon $83,200 amount. If this issue were to be decided on the basis of the preponderance of the evidence, then we would conclude that each side's explanation is significantly flawed, that the question is a close one, but that it is somewhat more likely than not that petitioners did receive a credit for the $52,368.75 against the debt they owed to Gloria Muroff, and so petitioners should be required to take this amount into income for 1970. However, fraud requires clear and convincing evidence. We conclude that respondent has not met his burden of proving by clear and convincing evidence that petitioners' $52,368.75 commission was properly includible in petitioners' 1970 tax return or that their failure to include this commission results in an underpayment of tax due to fraud. [40] *276 70-5
Respondent determined that petitioners had received $41,125 as "Value of Land Received for Services". At trial, respondent conceded that the land was worth only $17,200. Petitioners reported this $17,200 as a long-term capital gain, but noted on their tax return that they had received it for services. As respondent implicitly acknowledges, petitioners' error in this regard is not evidence of fraud. We believe this error to be consistent with petitioners' general confusion about record-keeping and tax-return preparing. 70-8 and 70-10
Petitioners erred in deducting a pass-through subchapter *277 S capital loss and in understating their long-term capital gains on two sales. Because of the $1,000 limit on deductions of capital losses against ordinary income (sec. 1212(b), as then in effect), petitioners derived little tax benefit from their errors. Also, a significant portion of their understatement of long-term capital gains on the two sales resulted from petitioners' treatment of interest as an expense of sale, instead of as a separate fully deductible expense. Petitioners' error in the treatment of their interest expense was an error in respondent's favor. As respondent implicitly acknowledges, petitioners' long-term capital gains errors are not evidence of fraud. Conclusions
In the notice of deficiency, respondent made adjustments for 1969 totalling $105,069.17. On brief, respondent breaks this down into 11 adjustments to taxable income. We agree with respondent's adjustment 69-4, that petitioners omitted $12,150 that they received. We agree with respondent's adjustment 69-6, that petitioners omitted $3,300 that Selbia received as wages from S.E.A. Corporation; however, petitioners are to be credited with the $588.80 that had been withheld from these wages. We agree *278 with respondent's adjustment 69-7 that petitioners omitted their long-term capital gain on the sale of their interest in the orange grove; however, the amount of the gain is unclear [41] and respondent failed to allow petitioners to deduct the $1,931.58 that was applied against their debt to Hartline. Respondent concedes two other adjustments (69-5 and 69-8), totalling $31,300. Of the six remaining adjustments, we have found in one (69-3) that petitioners overstated their income by $2,467.50, rather than understating it by $2,500 as respondent determined; we have held in three (69-1, 69-2, and 69-9) that respondent failed to prove by clear and convincing evidence that there were underpayments due to fraud; and in two (69-10 and 69-11) respondent determined that petitioners overstated their income. In the notice of deficiency, respondent made adjustments for 1970 totalling $136,968.47. On brief, respondent breaks this down into 11 adjustments to taxable income. We agree with respondent's adjustment 70-1, that petitioners omitted $1,500 *279 that they retained in the Kleinberg-Beecroft transaction. We agree with respondent's adjustment 70-4 that petitioners omitted $10,000 in the Schiff-Yesley transaction that they received by way of Muroff crediting this amount against petitioners' debt to Gloria Muroff; however, we agree with petitioners that respondent erred as to the remaining $22,000. We agree with respondent's adjustment 70-7, that petitioners omitted $1,700 that Selbia received as wages from S.E.A. Corporation; however, petitioners are to be credited with the $252 that had been withheld from these wages. Of the three remaining fraud items, we have held in two (70-3 and 70-11) that petitioners were required to include in income amounts credited against debts to Hartline but simultaneously became entitled to deduct these amounts, and we held in 70-2 that respondent failed to prove by clear and convincing evidence that there was an underpayment due to fraud. The five remaining items, all nonfraud, include two overstatements of income (70-10 and 70-6), one where respondent conceded the bulk of the adjustment and petitioners' error as to the rest was patent on the return (70-5), a derivative adjustment (70-9), and *280 a small capital gain adjustment (70-8). We have found that petitioners cooperated with respondent during the investigation. There is no evidence that petitioners failed to turn over any records to respondent or that petitioners attempted to falsify records or otherwise mislead respondent's agents. See Stratton v. Commissioner,54 T.C. at 287; Marinzulich v. Commissioner,31 T.C. 487, 492-493 (1958). See also Muste v. Commissioner,35 T.C. 913, 921 (1961). Petitioners not only instructed all Exchange Realty employees to give respondent's agents everything they asked for, but petitioners also hired certified public accountants to help respondent straighten out Exchange Realty's books. Were the issue before us, and particularly in light of the different standard of proof required, we would be inclined to impose the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a). However, that is not this case. [42] Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute. The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed *281 to be owing. Mere negligence does not establish either. Webb v. Commissioner,394 F.2d at 377; Carter v. Campbell,264 F.2d at 935-936; Thurston v. Commissioner,28 T.C. 350, 355 (1957). Respondent has not proven that petitioners were fraudulent for either 1969 or 1970. Consequently, respondent cannot rely on the exception set forth in section 6501(c)(1) to the general period of limitations set forth in section 6501(a). Since respondent relies on only the fraud exception for 1969, we hold that the statute of limitations bars the assessment and collection of any deficiency for 1969. Because we have concluded that the assessment for 1969 is barred by the statute of limitations, we do not reach the issue of unreported income for 1969. We hold for petitioners on this issue. II. Statute of Limitations -- Substantial Omission
Since we have found no fraud for 1970, respondent cannot rely on the exception set forth in section 6501(c)(1) to the general period of limitations in section 6501(a). Respondent has alleged in the alternative, that he is entitled to the 6-year period provided for in section 6501(e)(1)(A)[43] *283 for 1970. The generally *282 applicable 3-year period is extended to 6 years when there has been an omission from gross income of "an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return." Section 6501(e)(1)(A). In the case of a trade or business, "gross income" means gross receipts, prior to diminution by cost of goods sold. Section 6501(e)(1)(A)(i). The parties agree that, if respondent proves the 25-percent omission, then the statute of limitations does not bar assessment; otherwise, it does. The burden is on respondent to establish by a preponderance of the evidence that the 6-year statute is applicable. Stratton v. Commissioner,54 T.C. at 289; Philipp Bros. Chemicals, Inc. (Md.) v. Commissioner,52 T.C. 240, 254-255 (1969), affd. 435 F.2d 53 (CA2 1970); Williamson v. Commissioner,27 T.C. 647, 659, 662-663 (1957); see Peters v. Commissioner,51 T.C. 226, 230 (1968). The 6-year statute of limitations applies to both spouses on a joint *284 tax return where respondent proves that a sum was "properly includible" in the aggregate gross income of the joint taxpayers and exceeds 25 percent of the gross income reported. Benjamin v. Commissioner,66 T.C. 1084, 1100-1101 (1976), affd. 592 F.2d 1259 (CA5 1979). Respondent asserts that the gross income stated in petitioners' 1970 tax return is $81,384 [44] and that 25 percent of this amount is $20,346. Respondent contends that petitioners have omitted far more than $20,346 from their 1970 tax return. Respondent does not point specifically to the items that back up this assertion, but insists that the statute of limitations is open under the exception provided under section 6501(e)(1)(A). Petitioners assert that their total omissions from gross income for 1970, for purposes of section 6501(e)(1), are $9,751.11, which is made up of $3,021.79 of interest income (70-11), $5,036.32 of commission income (70-3) and $1,700.00 in wages from S.E.A. Corporation *285 (70-7). (Note that these three items total $9,758.11, not $9,751.11. See n. 12, supra.) Petitioners do not indicate what the amount of gross income stated on their 1970 return is, but are confident that $9,751.11 is not in excess of 25 percent of this amount. Consequently, petitioners conclude that respondent has failed to carry his burden of proving that the 6-year limitation period under section 6501(e)(1) is applicable. We agree with respondent's conclusion. 70-1
In 1970, Kleinberg forfeited a $3,000 deposit that was to be divided between Beecroft and petitioners as liquidated damages. We found that petitioners retained $1,500 of this deposit as liquidated damages. We hold that this $1,500 is an omitted item properly includible in petitioners' gross income for 1970. 70-2
In 1970, petitioners acted as the broker on a sale from Muroff to Miller. Petitioners thereby were entitled to receive a commission of $52,368.75. Respondent contends that petitioners received this commission by way of a credit against their debt to Gloria Muroff. Petitioners contend that they never received any part of this commission. In our analysis of the fraud issue, supra, we concluded that respondent *286 failed to prove by clear and convincing evidence that this commission was properly includible in petitioners' 1970 income. However, we also stated as follows: If this issue were to be decided on the basis of the preponderance of the evidence, then we would conclude that each side's explanation is significantly flawed, that the question is a close one, but that it is somewhat more likely than not that petitioners did receive a credit for the $52,368.75 against the debt they owed to Gloria Muroff, and so petitioners should be required to take this amount into income for 1970. However, fraud requires clear and convincing evidence. Since respondent's burden of proof on the 6-year statute of limitations question is to prove the omission by a preponderance of the evidence, and since respondent has carried this burden of proof, we hold that, for purposes of the 6-year statute of limitations, petitioners have omitted $52,368.75 that is properly includible in their gross income for 1970. 70-3 and 70-11
In May 1970, petitioners received a payment of $8,058.11 ($5,036.32 principal; $3,021.79 interest) from Hartline on a $50,363.20 note representing partial payment of the commission petitioners *287 earned on the sale of the orange grove. Notwithstanding our conclusion that an equal amount is allowable as a business expense deduction not claimed on their tax return, petitioners concede, and we hold, that this entire payment was omitted from their gross income for 1970, though properly includible for that year. 70-4
With regard to the discounting to Schiff and Yesley of the $50,363.20 note received as a partial payment for a commission earned by petitioners, we found, and so conclude, that petitioners received a $10,000 credit in 1970 against a debt owed to Gloria Muroff. Respondent contends that petitioners also received $22,000 in cash as a result of the Schiff-Yesley discount. We observed petitioners and their records. We observed respondent's witness, Muroff. In part I of this opinion, supra, we commented on the evidence as we see it. We conclude that petitioners' denials of receipt are more believable than Muroff's claims. We hold that petitioners omitted $10,000 that was properly includible in their gross income for 1970 but that they did not omit the other $22,000 determined by respondent. 70-7
Petitioners concede that they omitted $1,700 in wages paid to Selbia in 1970 *288 by S.E.A. Corporation, and that these wages are properly includible in their gross income for 1970. The remaining items are not omissions from gross income (note that item 70-6, discussed in part III of the opinion, infra, is not an omission item since it substitutes $43,276.87 for the $45,594.87 that petitioners reported on their 1970 tax return), although some of them affect the deficiency to be determined. To summarize, we conclude that petitioners omitted $73,626.86 of items that were properly includible in their 1970 gross income, as shown in table 6: Table 6
$ 1,500.00
Kleinberg-Beecroft liquidated damages
52,368.75
credit -- Muroff-Miller commission
8,058.11
credit -- Hartline note payment
10,000.00
credit -- Schiff-Yesley discount
1,700.00
wages -- S.E.A. Corporation
$73,626.86
We have concluded that the aggregate of the gross income items reported on petitioners' 1970 tax return is $136,176.42. Petitioners omitted from their gross income $73,626.86. Respondent has carried his burden of proving that petitioners omitted "from [their 1970] gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return," and so the *289 6-year statute of limitations applies and 1970 is not closed by the statute of limitations. We hold for respondent on this issue. [45]
III. Deficiency for 1970
In part I of this opinion, respondent had the burden of proving, by clear and convincing evidence, that there was an underpayment, some part of which was due to fraud; respondent failed to carry this burden. In part II, respondent had the burden of proving, by a preponderance of the evidence, that petitioners omitted from their *290 1970 tax return an amount of gross income which exceeds 25 percent of the gross income stated in their tax return; respondent carried this burden. In this part, petitioners have the burden of proving, by a preponderance of the evidence, that respondent erred in his notice of deficiency determinations as to matters of fact. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). 70-1
Respondent determined that petitioners omitted $1,500 that they had retained on account of a forfeiture of liquidated damages by Kleinberg. We found that petitioners did receive and retain this amount and did not report it as income. We hold for respondent on this issue. 70-2
Respondent determined that petitioners omitted $52,368.75 that had been earned as commission on a sale of real estate from Muroff to Miller; Muroff paid petitioners by crediting this amount against a debt owed by petitioners to Gloria Muroff. In part I of this opinion, we held that respondent had failed to prove by clear and convincing evidence that this commission was includible in petitioners's income. However, in part II of this opinion, we held that respondent had proven by a preponderance of the evidence that this commission *291 was includible in petitioners' income. Necessarily, petitioners have failed to prove by a preponderance of the evidence that respondent erred in his determination. We hold for respondent on this issue. 70-3 and 70-11
Respondent determined that petitioners omitted Hartline's payment of $5,036.32 principal and $3,021.79 interest on his commission note to petitioners; Hartline paid petitioners by crediting their debts to him. We found that petitioners received this payment and did not report it as income. We also found that they did not deduct Hartline's crediting of petitioners' debt, and that they did not deduct the $106.53 that they paid to Malooley on Hartline's behalf, thereby eliminating their debt to Hartline. We agree with respondent on this inclusion; we agree with petitioners on the deduction. We hold for petitioners on this issue. 70-4
Respondent determined that petitioners omitted $32,000 that they received from Schiff and Yesley in exchange for the Hartline note, which had a remaining principal balance of $45,326.88. Of this $32,000, petitioners were to receive $10,000 by way of a credit against their debt to Gloria Muroff, and $22,000 in cash. We found that petitioners *292 received the $10,000 credit and they failed to report it on their tax return. As we stated in part II, supra, we hold for respondent as to the $10,000 and we hold for petitioners as to the $22,000. 70-5
Respondent determined that petitioners had received land in exchange for services, that the land had a fair market value of $41,125, and that petitioners failed to report it on their tax return. Petitioners reported on their tax return that they received land in exchange for services. On Muroff's advice, they reported the transaction as a capital gain, on schedule D. To avoid even the appearance of misleading, they attached a statement to their tax return stating they they "received property in exchange for services rendered". They valued the land at $17,200. Respondent has conceded that the land's value was $17,200 (as petitioners had reported), and not $41,125 (as respondent had determined). Petitioners have conceded that they erred in reporting the $17,200 as a capital gain; it should have been reported as income in exchange for services. This item is to be treated in accordance with the parties' concessions; i.e., ordinary income is to be increased by $17,200 and capital gains *293 are to be decreased by $17,200. 70-6
Respondent determined that, in addition to the commission income dealt with in items 70-1 through 70-5, petitioners had commission income of $43,276.87. From the $175,306.94 total that respondent determined for items 70-1 through 70-6, respondent subtracted the $45,594.87 that petitioners reported on their tax return. Petitioners dispute respondent's determinations as to items 70-1 through 70-5, but agree with his treatment of item 70-6. We have set forth, supra, our determinations as to items 70-1 through 70-5. Item 70-6 is to be treated in accordance with the parties' agreement. 70-7
Respondent determined that petitioners omitted $1,700 in wages that Selbia had received from S.E.A. Corporation. We found that Selbia received these wages and that petitioners omitted them from their tax return. However, we also found that S.E.A. Corporation withheld $252 income tax and $81.60 F.I.C.A. taxes from these wages. It is not clear from the notice of deficiency whether respondent made any allowance for these withholdings. We hold for respondent as to the additional income. However, we also hold that petitioners are to be given credit for the $252 withheld *294 income tax; also, in calculating the amount of Selbia's self-employment taxes, petitioners are to be given credit for the withholding of the self-employment taxes from these wages. 70-8
Respondent determined that petitioners had long-term capital gains totalling $6,292.05. After the then-applicable 50-percent deduction of section 1202, this resulted in increasing petitioners' adjusted gross income by $3,146.02. Since petitioners reported capital losses and deducted $1,000 from adjusted gross income, respondent's adjustment was $4,146.02. Petitioners concede that they erred in reporting smaller amounts of capital gains [46] *295 and in reporting a "pass-through" subchapter S corporation loss. However, petitioners contend that (contrary to what they reported on their tax return) they are entitled to "roll over" the gain on the sale of one of the properties. Petitioners have failed to carry their burden of proof. We hold for respondent on this issue. 70-9
Respondent determined that petitioners overstated their itemized deductions by $172.23, but that this is solely derivative, and depends on our resolution of other adjustments. Petitioners agree. This is to be modified in the Rule 155 computation, in accordance with our determinations as to the other adjustments. 70-10
Respondent determined that petitioners are entitled to deduct $1,783.64 as interest expense; petitioners had erroneously treated it as expenses of selling certain capital assets. (See n. 46, supra.) The parties agree that the notice of deficiency is correct on this item, and we so hold. IV. Additions to Tax
Respondent determined that petitioners are liable for additions to tax under section 6653(b) for 1969 and 1970. We held in part I that respondent *296 failed to carry his burden of proving by clear and convincing evidence that petitioners committed fraud as to either 1969 or 1970. Although part I deals with the fraud exception to the statute of limitations (sec. 6501(c)(1)), that conclusion applies equally to the fraud addition to tax. See Asphalt Industries, Inc. v. Commissioner,supra;Botwinik Brothers of Mass., Inc. v. Commissioner,supra.
Petitioners' tax returns, records, and books of account were prepared or maintained negligently. However, respondent did not choose to proceed under section 6653(a) (negligence, etc.), even by way of alternative. Accordingly, even though 1970 is not closed by the statute of limitations, we do not have authority to impose any addition to tax on account of negligence. See section 6214(a). We hold for petitioners on this issue. * * * To the concern that all liability for tax for 1969 should not be avoided because respondent failed to bear his burden of proof as to fraud, we make the following response. Firstly, the interaction of the statute of limitations with the requirements as to fraud represents a compromise between two public policies determined by the Congress. People should be required *297 to pay their tax liabilities. But the Congress also has provided "that after a determinate period of time citizens can rest assured that their tax returns will not be reopened by zealous tax officials." Kreps v. Commissioner,351 F.2d at 4. Secondly, by December 1972, respondent's investigation of petitioners' 1969 income tax liabilities had proceeded to the point that respondent's Intelligence Division was conducting formal recorded interviews of Selbia, Phyllis and Holl. Petitioners' 1969 tax return was filed in July 1970. A notice of deficiency mailed by July 1973 would still have been within the general 3-year statute of limitations period for 1969. Section 6501(a). A notice of deficiency mailed by July 1976 would still have been within the special 6-year statute of limitations; respondent would have the burden of proof, but only by a preponderance of the evidence. Respondent chose to run the risk of the statute of limitations and to rely on the fraud exception to the general rule, with its inherent burden of proof by clear and convincing evidence. Section 6501(c)(2). The result we reach in the instant case is caused by respondent's failure to carry the burden of proof that *298 respondent chose to assume. Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section, subchapter, and chapter references are to sections, subchapters, and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue. ↩
2. Of these amounts, self-employment taxes under chapter 2 are $709.57 for 1969 and $917.94 for 1970; the remaining amounts are chapter 1 income taxes.↩
3. The self-employment tax adjustments and medical expense adjustments are derivative and depend both on the resolution of the issues for decision and on the settled issues.↩
4. Petitioners treated Wholesale Homes as an electing small business corporation under subchapter S. The parties stipulate that the subchapter S election was not timely, thus the election was not effective for the years before the Court. See 70-8 Long-Term Capital Gains,infra.↩
5. Selbia took a "Commercial Law" course at East Coast College in Fort Pierce, Florida, that consisted of reading a single paperback book over a three-night period. On the third night Selbia received a diploma that he hung on his office wall. Selbia took several Dale Carnegie courses in employee and public relations and hung diplomas from these courses on his office wall, too.Selbia also went to East Coast College two nights a week for about 6 weeks to prepare for the real estate salesman's State licensing exam.↩
6. Phyllis also took a Dale Carnegie course and the real estate salesman's State licensing exam course. See note 5, supra.↩
7. Holl's educational background in accounting consists primarily of home study courses coupled with 15 years of practical experience. ↩
8. Petitioners had two other bookkeepers for Exchange Realty before they hired Holl. ↩
9. In September 1970, Holl went to work for S.E.A. Corporation, until mid-December of the same year. Selbia was president and part owner of S.E.A. Corporation at the time of Holl's employment. After September 1970, Holl no longer performed any bookkeeping for Exchange Realty; however, Holl did his work for S.E.A. Corporation in Exchange Realty's offices.↩
10. Holl was from England, and so he had no experience in preparing United States tax returns and forms, other than the forms for Social Security, employment, and Florida sales taxes. Holl had his own Federal income tax returns prepared by H. & R. Block.↩
11. In order to facilitate reference to the notice of deficiency and the parties' briefs, we will use the same system of numbering that respondent has provided, although we do not necessarily consider the items in the same order as these numbers.↩
12. The correct sum of the nine monthly amounts in the indicated column is $107,647.06. Petitioners have not explained the $1,134.10 difference between this sum and the total that is on the 1969 journal and their 1969 tax return. Unfortunately, unexplained discrepancies seem to permeate the record in the instant case, including both sides' briefs.↩
13. Our addition of the 1969 journal entries shows a total of $134,771.78. Respondent has conceded a $1,000 item and a $8.75 item. If these concessions were applied to our computation, then the correct total would be $133,763.03; if applied to respondent's determination, then the correct total would be $133,074.77. Yet, respondent maintains on brief that "it is agreed this correction does not reduce the total below $134,083.52 included in income by respondent." Respondent does not explain this result. Petitioners deny any such agreement; their calculations agree with ours (i.e., a net of $133,763.03).↩
14. David Miller is the father of petitioners' son-in-law. ↩
15. Muroff has been engaged in the practice of law since 1953. He became acquainted with petitioners in 1968 and thereafter participated in many business dealings with them. Selbia trusted Muroff and often went to him for advice. ↩
16. A lawsuit by a New York broker resulted in a judgment in late 1972 against petitioners and Muroff in the amount of $15,984.50 (one-third of the total commission), plus interest of $1,760. ↩
17. Respondent adjusted petitioners' gross receipts for 1969 by $12,150. Respondent does not contend that the entire $24,300 is includible in petitioners' income, despite respondent's allegations that petitioners never paid Muroff his $12,150.
18. We include findings on conceded items which may be helpful in evaluating respondent's determinations as to fraud.↩
19. So stipulated. The Hartline-Selbia agreement, dated December 19, 1962, provides that Selbia is entitled to a $25,000 commission "upon the consummation of that certain contract, dated Jan. 16, 1963," between Hartline and the sellers of the orange grove. Of that amount, Selbia was to receive $1,250 in cash at the closing, together with an 8.636-percent interest in the orange grove.
20. So stipulated. In the notice of deficiency, respondent determined that the selling expenses were $5,829.44. The $640.09 difference is described in one exhibit as "Additional Costs".↩
21. The debt to Hartline was composed of the following items: ↩
Interest on orange grove mortgage
$ 2,713.85
Loss on grove operation
3,535.51
Interest on an unrelated loan
3,846.86
$10,096.22
22. It is obvious that $17,000 (the check from Malooley) plus $22,000 (the credit by Muroff) equal $39,000. Yet the parties have entered into two stipulations specifying that the mortgage was discounted for $38,000. The parties seem to recognize the discrepancy, but do not try to explain it.
23. The $106.53 represents the part of the mortgage payment due from Hartline to Malooley that Hartline had offset against petitioners' debt.↩
24. As a result of 69-10 Operational Loss,supra↩ ($361.68), and the $1,931.58 application against the debt on account of the excess of cash over selling expenses, petitioners were entitled to deduct $2,293.26 of this debt against 1969 income. They did not take any such deduction on the 1969 tax return.
25. The original sale price of $160,000 was increased by $8,000, the amount for which Muroff had already sold an orange crop (and also increased by $378 for certain taxes). Also, petitioners paid $9,000 of the $168,378 total by sale of an orange crop. Petitioners paid $8,061.34 in cash, $1,063.76 described only as "Cooper deal", $40,393.30 by assuming an existing first mortgage on the orange grove, $1,211.80 described only as "mortgage interest accrued -- last 6 mons. 1968", and $647.80 in certain stamp taxes. This left a balance due of $108,000.↩
26. Davie West is 100 acres, north of Davie Farmettes, acquired by Muroff in a foreclosure in July 1965. ↩
27. The $1,000 was Muroff's approximate cost to put a housing pad on each of his lots. A housing pad is a concrete pad about 70 X 70 feet on which a house could be later built.
28. Petitioners incorrectly computed their long-term capital gain on this sale, as shown on the sheet attached to their 1970 tax return, as follows: ↩
Cost
$7,550.00
Sold
11,500.00
Closing
460.00
Int. on Mtg.
402.91
Deprec.
377.00
$2,710.09
Profit
29. Petitioners incorrectly computed their capital gain on this sale, as shown on the sheet attached to their schedule D, as follows: ↩
Feb. 69 cost
$37,027.00
Aug. 70 sold
40,000.00
clos. cost
135.00
Rec. fees
170.45
Abst. fee
32.50
Int. Hwd. Fed.
1,380.73
$ 1,254.32
Profit
30. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
31. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (b) Time Return Deemed Filed. -- (1) Early Return. -- For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.
32. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. -- (1) False return. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. 33. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary. [This language reflects amendments in 1969 and 1976 which have no effect on the instant case.]↩
34. T.C. Memo. 1966-81↩.
35. T.C. Memo. 1959-172↩.
36. The question of whether petitioners' failure to include these wages in income results in an underpayment of taxes for either 1969 or 1970 is a direct function of where in the "stack" of income items the wages are placed.↩
37. The exact amount of this capital gain requires a determination of petitioners' basis in the property sold, an issue we do not attempt to resolve. Under present law, respondent need not prove the precise amount of an underpayment, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States,466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972); affg. v Memorandum Opinion of this Court (T.C. Memo. 1970-274); Kreps v. Commissioner,351 F.2d 1, 6 (CA2 1965), affg. 42 T.C. 660↩ (1964).
38. An exhibit introduced by respondent shows the following: Mruoff [sic] (check 7385)
$1,425.00
check 7966 3,000.00
$4,425.00
Check 7966 is a check to Muroff, but in the amount of $3,500, not $3,000. Petitioners do not claim that check 7966 was in payment of legal fees or is otherwise deductible. This check is listed in the 1969 journal, but is not explained; in the 1969 journal it is extended to a column that has no heading and is the only check extended to that column.↩
39. Respondent does not argue that petitioners had taxable income with regard to this $52,368.75 commission under any other theory (e.g., constructive receipt, fair market value of a negotiable note).↩
40. We note that both sides' schedules show amounts for interest in their respective "Increase in Debt" columns, albeit in different amounts and at different times. Voluntary partial payments on debts generally are treated as first applying to interest and then to reduction of principal. Motel Corp. v. Commissioner,54 T.C. 1433, 1440 (1970); Bayou Verret Land Co. v. Commissioner,52 T.C. 971, 985 (1969), affd. in part and revd. in part on other issues 450 F.2d 850↩ (CA5 1971). Petitioners' payments on their debt to Muroff are to be treated as payments of interest, deductible as such, in accordance with this general rule. The parties are to determine the amounts so deductible, in the Rule 155 computation.
41. Respondent determined that petitioners' taxable income should be increased $20,631.27. It may be that the increase should be as little as $8,436.23.↩
42. See Bishop v. Commissioner,T.C. Memo. 1986-2↩.
43. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (e) Substantial Omission of Items. -- Except as otherwise provided in subsection (c) -- (1) Income taxes. -- In the case of any tax imposed by subtitle A -- (A) General rule. -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph -- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item. [The subsequent amendment of this provision by section 1906(b)(13)[sic](A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant case.]↩
44. Respondent presents the following breakdown of the "amount of gross income stated in the return": ↩
Wages
$ 3,225
Interest
55
Gross Receipts (Schedule C)
45,595
Gains (Schedule D)
$ 2,710
1,254
17,200
21,164
Rents
4,459
Mortgage Income
6,886
$81,384
45. Respondent contends that petitioners stated on their 1970 tax return only $81,384 of gross income. (See n. 44, supra.) The difference between this amount and the amount shown in our findings in table 2, supra, depends (apart from rounding-off changes) on the application of section 6501(e)(1)(A)(i) to the capital gain and loss transactions that petitioners reported on schedule D attached to their tax return. Since 1970 is not closed by the statute of limitations even if we were to apply section 6501(e)(1)(A)(i) in a manner most favorable to petitioners, it would serve no purpose to analyze how that provision should be applied in the instant case. See Insulglass Corp. v. Commissioner,84 T.C. 203↩ (1985).
46. Petitioners reported capital gains of $2,710.09 and $1,254.32 (for a total of $3,964.41) instead of $3,657 and $2,637.05 (for a total of $6,292.05). As to one property, petitioners improperly subtracted $377 of previously claimed depreciation from the sale price, instead of from the basis. Thereby, they reduced the capital gain by $754. Petitioners also erroneously subtracted interest payments totalling $1,783.64 from the sales prices, thereby erroneously increasing their capital gain but also depriving themselves of an ordinary deduction for the interest. Petitioners also made other errors which increased by $210 the capital gain they reported.